---
Curtis *v.* The State.
---

## TIP *alias* J. H. CURTIS *v.* THE STATE.

1. EVIDENCE. *Dying declarations.* In order to render a statement admissible as a "dying declaration," it is not necessary that the deceased should *state* in language, at the time of making it, that he was conscious of impending dissolution. It is sufficient if the facts and circumstances reasonably satisfy the judge that the declarant was *in extremis*, and laboring under the impression of impending, or almost immediate, dissolution.

2. SAME. Dying declarations are admissible in evidence without regard to whether there is other evidence as to the transaction capable of being produced or not.

3. DEPOSITIONS IN CRIMINAL CASES. A deposition taken by an accused person without an order of the court, cannot be read as evidence, though taken by the consent of the attorney-general.

---
FROM DAVIDSON.
---

Appeal in error from the Criminal Court of Davidson county.  MATT. W. ALLEN, J.

LYTTON TAYLOR for Curtis.

ATTORNEY-GENERAL LEA for the State.

COOKE, J., delivered the opinion of the court.

Tip *alias* J. H. Curtis and one James Tooms were jointly indicted for the murder of one Bud Vaughan. Curtis was tried and convicted of murder in the second degree. A motion for a new trial was overruled and he has appealed to this court.

It is not seriously insisted that the testimony that was before the jury does not fully sustain the verdict, and a careful examination of the record leaves no doubt upon that subject. No exception has been taken to the charge of the court, and the only questions relied upon for reversal arose during the progress of the trial. The first error assigned and insisted upon is the admission, over the objection of the defendant, of the dying declarations of the deceased. The injuries from which he died were inflicted on Thursday night, and from which he died the Monday night following. He was cut with a knife in four places. Two of these wounds were in the back and were not severe, and two severe cuts, one upon each arm, the one upon the left arm being just above the elbow, about four inches long and penetrating to the bone, and which severed the main artery. From this wound mortification supervened upon Saturday, the arm was amputated on Sunday, near the shoulder, and he died, as above stated, on Monday night. He was very greatly prostrated from the first from loss of blood.

When the witnesses who carried him from the street where the occurrence took place, first got to him they thought he was dead. One witness says he was as white as a sheet, another that he was pale and emaciated, though he afterwards revived.

The State introduced on the trial the widow of the deceased as a witness, who testified, among other things not excepted to, as follows: "He (the deceased) left home about eight o'clock that night. When I next saw him at the hospital he was nearly dead." She then describes his wounds and continues: "He continued to grow worse. On Saturday he requested to be taken home. He was carried with the utmost care on a litter. Taking him home seemed to improve him some. On Sunday morning his left arm having mortified was amputated by Drs. Briggs and Blake. Almost his entire arm was taken off. He had every attention that could be bestowed upon him.  *  * After the amputation he seemed to revive, and seemed to be better, but on Monday morning he was very weak, and continued to sink until his death, between eleven and twelve o'clock that night. He told me not to be anxious about him. Up to twelve o'clock Monday he spoke hopefully of his condition and seemed to be more solicitous about me, as I was in very delicate health and very weak. About one o'clock Monday, he said: 'If I must die, I will say Tip Curtis is the man who cut and killed me.' He soon after called for the insurance policy on his life, which was made payable, the most part, to me, and had it read to him. He asked me if that was satisfactory.

At six o'clock Monday evening he called me to his bedside and spoke of death, and seemed to be sinking rapidly. He said he was not doing any thing to Tip Curtis when he cut him; that he and Hickman were standing in the street, when Curtis, without warning, commenced to cut him in the back; that he turned, put out his hands to defend himself, when Curtis inflicted the two wounds upon his arms."

It is insisted, for the defendant, that these statements of the deceased were improperly admitted as dying declarations, because, as is urged, it does not sufficiently appear that the deceased was *in extremis* at the time he made them, or that he knew himself to be so; and also, because there were eye witnesses to the transaction, and who testified in the case, and for that reason dying declarations were inadmissible.

From the condition in which the deceased is shown to have been, and all the facts and circumstances of the case, we are fully satisfied that at the time he made the statements in relation to the transaction, he was not only *in extremis*, but was conscious of his impending dissolution. It was not necessary that he should so state in language, but it is sufficient if the facts and circumstances are such as to reasonably satisfy the judge that he was *in extremis*, and laboring under the impression of impending or almost immediate dissolution: 9 Hum., 20, 21.

That he was *in articulo mortis* and conscious of his condition at six o'clock, when he detailed the circumstances of the occurrence, and which was but about three and a half hours before his death, is, we think,

too plain to require discussion. Even if it were doubtful—which we do not think it is—as to whether he was conscious of his impending dissolution at one o'clock, when he made the first statement, it will be observed that the only statement then made was that "Tip Curtis had cut him and killed him." This was an undisputed fact, established by all the witnesses on both sides, and not denied, that the wounds which produced his death were inflicted by the defendant. And even if this declaration had been improperly admitted as evidence, it could by no possibility have injured the defendant. But the condition of the deceased at the time, and the manner in which he introduced the subject and the conversation in connection with the declaration, satisfy us that he made both statements under a sense of impending dissolution.

There is nothing in the last objection. While some writers, speculating upon the reason or policy of the law in admitting dying declarations as evidence, have assigned as one reason for it, the necessity of the rule, in order to prevent the guilty party, by his own wrongful act, from destroying the evidence of his guilt, yet all our cases have admitted this testimony without regard to whether there was other evidence as to the transaction.

The next error insisted upon is the exclusion of a deposition of James Tooms, the other defendant in the indictment, taken and offered in evidence by the defendant. This deposition did contain evidence material for the defendant, and if improperly excluded it was error. The deposition appears to have been taken

before a notary public in Davidson county, by the defendant, and sworn to on the 6th of November, 1883; the trial began the 29th of February, 1884. It has neither caption or certificate, and was never filed as evidence in the cause. It is stated at the beginning that it is taken by consent, but whose consent is not stated, and at the bottom and below the notary's signature is written the words "cross-examination waived, but with right to re-examine if desired hereafter." This is not signed by any one. The record states that "the defendant had closed his case, and his counsel then retired to consult, and while they had done so within a few feet of the court room, a witness, Bolton, was put on the stand in rebuttal, by the State, and examination had commenced, when the attorney-general was notified to stop. The defendant's counsel offered to read the deposition, when the attorney-general objected because of want of notice, and because it had not been filed, and was in possession of the defendant. The court then suppressed it on the ground, solely, because the deposition had never been filed. The defendant offered to file it, which the court refused to allow to be done. The court also said, when objection was first made, that defendant had closed his case; that it was then too late to offer it if otherwise regular, to which the defendant excepted. The defendant offered to prove by assistant attorney-general that he was present and waived cross-examination." The record here presented is rather novel in its character, to say the least of it.

By the provisions of the Code, section 5378, "the

accused may, by order of the court, have the depositions of witnesses taken in the manner prescribed for taking depositions in civil cases, on notice to the district attorney." By Code, section 3837 (in civil actions), "the deposition of any person residing in the county in which the suit is pending, may also be taken by either party, but the opposite party may summon the witness, in which case he shall be examined as if summoned by the party taking his deposition."

By the section of the Code first above cited, it will be seen that in criminal cases depositions can only be taken by the accused, by order of the court, and upon notice to the attorney-general, and without such an order no such authority or right can exist, by consent of the attorney-general or otherwise, much less by the consent of some one, the record does not disclose who, designated as assistant attorney-general, a person wholly unknown to the law. It is also shown by his affidavit, filed in support of a motion for a new trial, that the notary before whom it was taken, or rather who took the deposition, was of counsel for the defendant, and who kept it from the time it was taken until it was offered in evidence as above stated.

The deposition was most clearly inadmissible, for obvious reasons, and the action of the court most clearly right in excluding it. It is therefore wholly unnecessary to inquire whether he gave the right reason for his action or not, or whether the attoney-general presented the most fatal objections to its admission.

It is shown by the record that when the jury were out, being at Scott's hotel in the charge of sworn officers, after they had agreed upon their verdict, one of the jury desired to be shaved, and one of the officers in charge of the jury took him to a barber shop, which was a room near by in the same hotel, for that purpose, leaving the other jurors in charge of another sworn officer. The affidavits of the officer, the juror and the barber, all concur that he neither spoke to any one or was spoken to while being shaved or absent from the jury. While the practice of allowing jurors to separate for any cause is not to be encouraged, yet where it can be shown, as has been done in this case, that a juror could not possibly have been tampered with while absent from his fellows, such separation will not vitiate the verdict. Immediately after the juror having been shaved, as shown by these affidavits, the jury returned their verdict.

There are other questions attempted to be raised by the unsupported affidavit of the defendant, but it has been often held that the unsupported affidavit of the prisoner after conviction is insufficient for any purpose.

We find no error in the record, and the judgment will be affirmed.